AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

The cellular telephone assigned call number (414) 364-2169 ("**Target Telephone**") and the information about the location of the **Target Telephone**, whose wireless service provider is T-Mobile, a company headquartered in Parsippany, New Jersey.

)
)
)
)
)
)
)

Case No. 17M093

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
  ☒ evidence of a crime;
  ☒ contraband, fruits of crime, or other items illegally possessed;
  ☒ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

The application is based on these facts: See attached affidavit.

  ☒ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Richard Bilson, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: June 22, 2017

*Judge's signature*

City and State: Milwaukee, Wisconsin       Honorable David E. Jones, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Richard H. Bilson, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned telephone number (414) 364-2169, subscribed to by Unknown and known to be used by Alexander T. Jenkins, aka "Wax," with wireless service provided by T-Mobile (hereinafter referred to as "**Target Telephone**"). The **Target Telephone** is further described in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I have been employed with the Federal Bureau of Investigation (FBI) as a Special Agent since January of 2010. I am currently assigned to the FBI Southeastern Wisconsin Regional Gang Task Force (SWRGTF). I have participated in narcotics investigations which involved violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and firearms investigations, which involved violations of Title 18, United States Code, Section 922(g)(1), and other related offenses. I have had both formal training and have participated in numerous gang and drug trafficking investigations.

3. During my career in law enforcement, I have investigated violations of federal narcotics laws and related violations, including federal firearms and money laundering offenses. I have had formal training and have participated in numerous

complex drug trafficking investigations, including several investigations using wiretaps. Based upon my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

      a.     I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

      b.     I have also relied upon informants to obtain controlled substances from dealers;

      c.     I have extensive experience conducting surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where drugs, drug paraphernalia, and drug trafficking records were seized;

      d.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

      e.     I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

      f.     I know that drug traffickers often use various communication devices to conduct drug trafficking operations, and that drug traffickers often communicate on cell phones using text messages and direct connect cell phone capabilities;

      g.     I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

      h.     I have been assigned to court authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations. Furthermore, I have listened to hundreds of coded drug related phone calls between drug suppliers and customers and have later interviewed numerous drug dealers whose conversations had been intercepted regarding these coded conversations;

i. I know that drug traffickers often list their telephones in nominee names in order to distance themselves from telephones that are used to facilitate drug trafficking; and that drug traffickers frequently change phone numbers in an effort to thwart law enforcement; and

j. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement.

4. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

5. I am currently participating in an investigation of heroin and cocaine trafficking involving Kavanaugh COLEMAN, Joshua BROWN, Shadell BURKS, Alexander JENKINS, Kendrick DAVIS, Marcello MAYS, Olajawan VEASY and Omar TRIGGS, among others. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) Title III wire intercepts of a telephone utilized by COLEMAN; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; and (c) information obtained from numerous witnesses, including confidential sources.

6. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those

3

federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating witnesses, and informants, whose reliability is established separately herein.

7. The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; recorded conversations; controlled buys; Title III wire intercepts; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that JENKINS has violated Title 21, United States Code, Sections 841 and 846. JENKINS was charged with these crimes on June 6, 2017 and is the subject of an arrest warrant issued on June 7, 2017. There is also probable cause to believe that JENKINS is aware of these charges and has fled. There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting JENKINS, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## PROBABLE CAUSE

9.  This investigation was initiated in July of 2016. To date, case agents have determined that a group of individuals, both known and unknown, are involved in a drug trafficking organization led by Kavanaugh COLEMAN, which case agents refer to as the "COLEMAN DTO." The COLEMAN DTO distributes large quantities of heroin and cocaine in and around the Milwaukee, Wisconsin metropolitan area.

10.  In July of 2016, case agents interviewed a confidential source of information (CS-1). CS-1 provided case agents with information regarding a drug trafficking organization that is operating in the City of Milwaukee and is distributing large quantities of heroin throughout the greater Milwaukee area. CS-1 identified several individuals involved in this organization, including Kavanaugh COLEMAN. CS-1 stated that s/he has observed COLEMAN in possession of more than 20 kilograms of cocaine and CS-1 stated that between February and September of 2016 CS-1 observed COLEMAN sell more than 3 kilograms of heroin. CS-1 further stated that COLEMAN "fronts" cocaine and heroin to members of his drug trafficking organization (COLEMAN DTO) who then distribute street level and retail level quantities of heroin to their customers, that is, COLEMAN provides heroin and cocaine to members of his drug trafficking organization with the expectation that payment will be made after the drugs have been sold.

11.  For several reasons, case agents believe that CS-1 is reliable and credible. First, CS #1 has been providing continuous information since May of 2016. Second, the information CS-1 has provided is substantially against CS-1's penal interest. Third, the

information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not utilized, and substantial portions of CS-1's information has been corroborated through independent investigation, including surveillance and information from other sources. For example, CS-1 stated that s/he contacted COLEMAN using (414) 519-1818 to purchase heroin, which was corroborated by toll records and information from other sources. Fourth, CS-1 has made statements to case agents that are against his/her penal interests, in that CS-1 has admitted his/her involvement in the COLEMAN DTO's activities in the past. Finally, CS-1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS-1 has prior convictions for Possession of THC, Possession with Intent to Deliver Cocaine, Fleeing/Eluding an Officer, and Receiving Stolen Property. CS-1 is currently on probation/parole status for his/her conviction of Possession with Intent to Deliver Cocaine. CS-1 is cooperating in exchange for financial benefits. To date, CS-1 has received $850.00 in exchange for his/her cooperation on this investigation. CS-1 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting. In November of 2016, case agents observed CS-1's vehicle during a controlled buy of heroin from COLEMAN. Case agents suspected that CS-1 delivered heroin to a drug customer on behalf of COLEMAN and this activity was not under the direction and control of law enforcement. Case agents subsequently approached CS-1 to inquire whether s/he had engaged in this unauthorized criminal activity and CS-1 admitted to engaging in

unauthorized criminal activity. Since that time, CS-1 has continued to provide intelligence regarding the COLEMAN DTO to case agents and case agents continue to believe that the information provided by CS-1 about the COLEMAN DTO is truthful and reliable because it has been corroborated through independent investigation.

12. CS-1 provided information regarding COLEMAN, aka "KG." CS-1 stated s/he had been inside of multiple residences owned by COLEMAN and has observed COLEMAN in possession of kilogram quantities of heroin and cocaine. CS-1 stated that s/he has personally observed COLEMAN engaged in large-scale drug trafficking as well as street-level drug dealing. CS-1 stated that s/he has known COLEMAN for approximately 10 years and has known COLEMAN to be a drug dealer the entire time. CS-1 stated that COLEMAN is armed with a black in color, Glock brand, semi-automatic pistol, with extended 30 round magazine, when he is conducting drug transactions as he attempts to protect himself and his narcotics business from rival drug dealers and those who may be looking to rob him.

13. CS-1 stated that COLEMAN has a source of supply in Chicago, Illinois and will meet with his source in Gurnee, Illinois twice a month to pick up kilogram quantities of heroin. CS-1 stated that COLEMAN has a network of drug traffickers that he provides heroin to that traffic heroin on behalf of COLEMAN. CS-1 stated that s/he has known COLEMAN for approximately 10 years and used to be business partners with COLEMAN in a cleaning business that both CS-1 and COLEMAN started with proceeds from narcotics trafficking. It was during this partnership that CS-1 began dealing in illegal narcotics trafficking with COLEMAN until 2013 when CS-1 was arrested and

7

prosecuted for narcotics trafficking. CS-1 further stated that COLEMAN is a member of the Gangster Disciples street gang, which originated in Chicago, Illinois in the 1960s and further stated that COLEMAN has several close family ties to Chicago, Illinois and Gangster Disciple gang members in Chicago, Illinois.

14. CS-1 stated that COLEMAN sells heroin for $90 to $100 per gram and stated that after COLEMAN obtains the kilograms of heroin, he typically takes those kilograms of heroin to a house CS-1 identified as 3050 N. Richards Street, Milwaukee, Wisconsin. CS-1 stated that COLEMAN owns 3050 N. Richards Street and meets with other members of the COLEMAN DTO there and breaks down the heroin and prepares it for distribution to other members of the DTO at 3050 N. Richards Street. CS-1 also stated that 3050 N. Richards Street is equipped with a surveillance camera system that feeds to a computer screen in the living room area of the residence.

15. CS-1 identified Alexander Jenkins, aka "Wax" as a member of the Coleman DTO. CS-1 stated that CS-1 has never obtained narcotics from Jenkins; however, CS-1 has been around JENKINS over 100 times in the past two years and has observed JENKINS in possession of heroin and cocaine base for sale. CS-1 stated that CS-1 observed JENKINS obtain heroin directly from Coleman. CS-1 stated that on approximately ten occasions, CS-1 has personally given heroin, which came from Coleman, to JENKINS and then CS-1 would return the money provided by JENKINS to Coleman. CS-1 further stated that JENKINS and Kendrick DAVIS got into a shootout with COLEMAN and Shadell BURKS near 38th and Good Hope in March or April of 2015. CS-1 stated COLEMAN and JENKINS "had some words" over a dope phone, the next time they met up all of the guns

8

came out, and people started shooting. CS-1 stated no one was hit except for some houses. CS-1 stated COLEMAN paid for repairs to all of the houses so that no one would snitch on him. CS-1 stated that after that incident there was a meeting of COLEMAN DTO members at Conrad Davis' house off Townsend where everything was resolved. CS-1 stated s/he was present and that everyone had guns at the meeting including AK-47s.

16. CS-1 further stated that COLEMAN and members of his DTO utilize the Economy Auto Shop, located at 6030 N. 91st Street, Milwaukee, Wisconsin to engage in the sale of heroin and cocaine. CS-1 further stated that s/he has observed multiple firearms at 6030 N. 91st Street in the past and has observed firearms in the auto shop as recently as November of 2016. CS-1 identified Khizri Mirzoev, the listed owner of 6030 N. 91st Street, as an individual s/he only knew as "Izzy" and stated that Izzy would commonly sell firearms to convicted felons at 6030 N. 91st Street. CS-1 further stated that when COLEMAN was on probation/parole status with the State of Wisconsin, COLEMAN would pay Khizri Mirzoev, aka "Izzy," $300 per week and in exchange, Mirzoev would provide COLEMAN a check stub to show his probation officer. CS-1 stated that COLEMAN never actually worked at the auto shop at this time, but rather, COLEMAN would only sell narcotics from the parking lot.

17. Additionally, in May of 2017, a source of information (SOI) told case agents that s/he observed multiple sales of firearms to felons taking place inside Economy Auto at 6030 N. 91st Street, including the sale of a fully automatic, AR-15 assault rifle. The SOI stated s/he has known the owner of the business, Khizri Mirzoev, since 2009, and has

9
Case 2:17-mj-00093-DEJ   Filed 06/26/17   Page 10 of 19   Document 1

worked at the business both full, and part time. The SOI identified Kavanaugh COLEMAN as a drug dealer, who utilizes 6030 N. 91st Street to distribute narcotics. The SOI has known COLEMAN since 2010. In the last 3 years, the SOI has observed COLEMAN to engage in drug dealing from the business parking lot of 6030 N. 91st Street. The SOI has seen COLEMAN to be in possession of large quantities of heroin, and cocaine, as well as bulk U.S. currency.

18. The SOI stated in 2014, COLEMAN directed the SOI to hide a backpack containing a large amount of heroin, cocaine, and U.S. currency inside of a vehicle that was parked in the business lot of 6030 N. 91st Street. The SOI stated s/he has observed over 100 instances, where COLEMAN, and other co-conspirators conducted drug deals in the business lot of 6030 N. 91st Street. The SOI stated that s/he had conversations with the owner of the business, Mirzoev, regarding the drug dealing activities in the business lot and how it may attract the attention of law enforcement. The SOI stated Mirzoev told the SOI not to worry about it.

19. The SOI identified Shadell BURKS, Alexander JENKINS, Joshua BROWN, and Kendrick DAVIS, as all being involved in drug dealing on the business lot of 6030 N. 91st Street. The SOI further stated in 2015, s/he directly observed the owner of the business (Mirzoev) sell a 10 mm Glock pistol to JENKINS, who is a convicted felon. Case agents believe the information provided by the SOI to be truthful and reliable because the SOI has provided information, which case agents have been able to corroborate through surveillance, controlled buys, and other witness and law enforcement reporting.

The SOI provided this information anonymously and without any expectation of monetary gain.

20. On February 9, 2017, at approximately 4:30 p.m. SYKES walked into the emergency room of Saint Joseph's Hospital, 5000 West Chambers Street, Milwaukee, Wisconsin. Sykes was suffering from a through and through gunshot wound to his upper left thigh. Sykes told Milwaukee Police Detective Michael Martin that when the incident occurred he was at the Economy Auto Repair and Auto Body, located at 6030 North 91st Street, Milwaukee, Wisconsin. SYKES stated that he was with Kavanaugh COLEMAN, who SYKES knows as "KG" just prior to being shot by an individual known to SYKES as "Wax." After being shot, SYKES stated that Khizri Mirzoev, the owner of the Economy Auto, drove him to the hospital. SYKES did not provide officers with an explanation as to why "Wax" shot him. Mirzoev told investigating officers that he did not witness the shooting, but drove SYKES to the hospital. Mirzoev told officers that SYKES is a friend of COLEMAN, who Mirzoev also knows as "KG." COLEMAN did not remain at the scene and has not been interviewed regarding this incident. On February 14, 2017, Milwaukee Police Detective Michael Martin showed SYKES a photo array in which JENKINS aka "Wax" was the target. Detective Martin utilized the State of Wisconsin, Department of Justice best practice method when showing SYKES the photo array. SYKES positively identified JENKINS as the individual who shot him on February 9, 2017. JENKINS was subsequently charged with 1st-Degree Recklessly Endangering Safety and Possess Firearm-Convicted of a Felony in Milwaukee County Circuit Court

Case No. 2017-CF0-01004. On February 27, 2017, JENKINS posted $25,000 cash bond and was released from the Milwaukee County Criminal Justice Facility on bond.

21. Case agents listened to jail calls made from the Milwaukee Criminal Justice Facility and heard JENKINS, aka "Wax," make a three-way phone call, using another inmate's pin number, to SYKES. During one call, JENKINS is heard telling SYKES that he is going to "cash him out" to drop the shooting charges against him or in JENKINS words, "get him out the way." JENKINS inquires when "Mychal" is going to the District Attorney's Office and if he needed a ride there. JENKINS is heard stating he would pay SYKES between five to ten thousand dollars total in order not to testify against JENKINS.

22. After the shooting of SYKES by JENKINS, CS-1 stated that COLEMAN told him that JENKINS shot SYKES because he was upset with SYKES because SYKES had stolen a cell phone from him that contained numbers for his drug customers. CS-1 further stated that COLEMAN told CS-1 that he was going to call a meeting for members "of the group" and was going to put an end to the "drama going on." CS-1 stated COLEMAN told him that he would not allow any retaliation by SYKES against JENKINS because it would attract too much attention from law enforcement and would be "bad for business."

23. On Tuesday, June 6, 2017, a federal grand jury in this district returned a sealed indictment charging JENKINS with knowingly and intentionally conspiring to distribute 1 kilogram or more of a mixture and substance containing heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 and Title 18, United States Code, Section 2; distribution of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections

841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2 and possession of a firearm during and in furtherance of a drug trafficking offense, in violation of Title 21, United States Code, Section 924(c)(1)(A)(i). *See United States v. Kavanaugh Coleman, et. al*, Case No. 17-Cr-96 (E.D. Wis.). On Wednesday, June 7, 2017, an arrest warrant was issued for JENKINS.

24. On Thursday, June 8, 2017, when numerous members of the COLEMAN DTO were arrested, CS-1 contacted case agents and informed them he had received a telephone call from JENKINS from the **Target Telephone,** 414-364-2169. CS-1 stated that JENKINS told CS-1 that he was currently in Las Vegas, Nevada and was scheduled to fly back to Milwaukee, Wisconsin the following day. Case agents obtained flight records and confirmed JENKINS was scheduled to fly from Las Vegas, Nevada to Milwaukee, Wisconsin during the evening and early morning hours of June 8 and arrive in Milwaukee on June 9, 2017 at 4:15 a.m. CS-1 stated that JENKINS told CS-1 that he was not going to get on the flight because of the multiple arrests which occurred on June 8, 2017 of co-conspirators in this investigation. Case agents met the flight at Mitchell International Airport in Milwaukee, Wisconsin on June 9, 2017 at approximately 4:15 a.m. Case agents confirmed that JENKINS was not on the flight.

25. On June 21, 2017, case agents received information from a source of information (SOI) that JENKINS drove back from Las Vegas, Nevada to Milwaukee, Wisconsin on June 9, 2017 with an unidentified female. Case agents believe the information provided by the SOI to be truthful and reliable because the SOI has provided information in the past that case agents have been able to corroborate through other

13

witness and law enforcement reporting. The SOI provided this information anonymously and without any expectation of monetary gain.

26. On June 21, 2017, case agents contacted the T-Mobile Law Enforcement Relations Group who confirmed that the **Target Telephone** was still active.

27. Based on the information above, I submit that there is probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting JENKINS, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## AUTHORIZATION REQUEST

28. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and

14

can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

29. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Telephone**.

30. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

31. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

15

Case 2:17-mj-00093-DEJ   Filed 06/26/17   Page 16 of 19   Document 1

32. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile for a period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number (414) 364-2169, whose wireless service provider is T-Mobile (**"Target Telephone"**), a company headquartered in Parsippany, New Jersey.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Telephone** described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the **Target Telephone** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).